BAILEY *v.* STATE.

(Division A. June 9, 1947.)

[31 So. (2d) 123. No. 36502.]

**T. N. Gore** and **Ney M. Gore, Jr.,** both of Marks, for appellant.

**Greek L. Rice**, Attorney General, by **Geo H. Ethridge**, Assistant Attorney General, for appellee.

Argued orally by **T. N. Gore**, for appellant, and by **Geo. H. Ethridge**, for appellee.

**Roberds, J.,** delivered the opinion of the court.

Appellant was convicted of the murder of James Bailey, his son, and sentenced to the state penitentiary for life by the jury. On this appeal he contends, (1) that, under the facts and the applicable law, he is not guilty of any crime and that his request for a peremptory instruction should have been granted, but, if not, (2) he could not be convicted of a greater crime than manslaughter, and (3) the trial court erred in granting to the State two instructions of which complaint is made.

In our opinion the first two contentions are not well taken and it was not error to grant one of the instructions. However, it was reversible error under the circumstances of this case to grant to the State the other instruction. The instruction reads: "The court charges the jury for the State that the mere fact, if it be a fact, that the defendant was a smaller man than the deceased, of less powerful build and proportions and of greater years, and was assaulted by the deceased with his fists at the time of the fatal difficulty, does not and cannot in law excuse or justify the defendant in taking the life of the deceased."

It was granted under these circumstances: Appellant's plea was self-defense. He says he shot his son, although he did not intend to kill him, because he was in real and apparent danger of losing his life or suffering great bodily harm as the result of an attack which his son was then making upon him. James was living in the home of appellant and his wife. Bitter feeling had developed between the father and the son. The son had cursed and used abusive language towards the father a number of times and had threatened to give the father a whipping. Appellant had demanded that the son move from the home, which the son had refused to do—at least until he had cultivated and gathered a crop. James was a strong, vigorous young man about thirty-two years of age, weighing about one hundred sixty pounds, un-

married. Appellant was sixty-four years of age, weighed one hundred ten pounds, had been ill for some time and had little use of his right arm, which theretofore had been badly injured in an automobile wreck. The night before the morning of the tragedy the son had slept in a room adjoining one in which appellant and his wife, the mother of deceased, had slept. The parents had occupied the same bed. Shortly after daylight appellant, or his wife, called to James to get up and make a fire in the stove in their room. What then happened can best be told in the words of appellant, there being no contradiction of his testimony in this respect:

"A. Well, I called him to make a fire. I was sick. I didn't feel like getting up and making a fire. At morning, I always made the fire myself. The stove was hot with the coals. He put on the kindling and things, and he come back with the coal oil can. I says, 'Son, don't put no coal oil in there. The stove will blow up. Just let it alone, it will burn in a minute or two.' He says, 'Who is making this fire, you or me?' He says, 'You are always giving orders, and never doing nothing.' And went on after the coal oil, and called me a dam slickheaded son of a bitch, and come on back and put the oil in the stove. Anyway he just kept on cussing. I says, 'Son, hush cussing me, please hush. Don't cuss me that way.' I didn't feel like taking it. He just kept on. I say, 'If you don't hush, I am going to have something done about it. I can't stand that cussing. I am getting too old to take abuse, don't like to listen to it.' And when I said that, he jumped up and made for me, and had his fist drawed back. So I didn't know nothing else to do but try to protect myself. I got the gun and shot.

"Q. What did he say, when he came towards you on the bed? A. 'There isn't a dam thing you can do about it.'

"Q. What did he say he was going to do to you? A. He was going to beat me to death. He had said a time or

two he was going to beat me to death. I knew he could do it.

"Q. What do you remember about what happened at that time? Tell the jury. A. I don't remember, Judge, what happened after it was done. It was done so quickly, I don't remember hardly what was—

"Q. When you shot with that pistol, did you aim to kill your son? A. No, sir; I didn't intend to, because I was not doing it for nothing in the world—

"Q. Just what was in your mind, at the time you fired the shot, Mr. Bailey? A. Tried to keep him from beating me, beating me to death. I was not aiming to take a beating."

The record discloses two other situations which have a bearing upon the question under consideration. The first is that some of the witnesses said that the deceased, after he was shot, fell to the floor on his back at the foot of the bed, his feet being about 12 inches from the foot thereof, his head extending away from the bed, while others testified that he fell on the side of the bed occupied by appellant and that his feet were about midway of the bed, his head extending beyond the foot thereof. That, of course, bears upon how close James had gotten to appellant when the shot was fired.

The second situation is that there was a claw hammer lying close to the left hand of the deceased. Some witnesses place it near his hand and some two or three feet away under a dresser some six feet from the foot of the bed. However, no one testified that the deceased had this hammer in his hand when attempting to make his attack upon the father. Appellant said he did not notice the hammer in the hand of James and did not know whether he had it.

In Hill v. State, 94 Miss. 391, 49 So. 145 (second appeal 97 Miss. 304, 52 So. 630), the reporter deduced this rule from the decision of this Court in that case: "The rule in homicide cases that 'great bodily harm,' in contemplation of law, does not mean such harm as may be inflicted

by mere blows with the hands or feet, is subject to the modification that where deceased was so much larger and stronger than defendant, that defendant was liable to receive great bodily injuries at his hands, he may be justified in using a deadly weapon to protect himself, although deceased was wholly unarmed.''

In Cook v. State, 194 Miss. 467, 12 So. (2d) 137, 138, this Court, speaking through Chief Justice Smith, used this language: ''The appellant had the right to defend himself against the attack made on him by the deceased, and the only question to be determined is whether or not he had the right to use a deadly weapon for that purpose. He had the right to use such a weapon if, but not unless, it reasonably appeared to him to be necessary to protect himself from death or great bodily harm at the hands of the deceased. A mere assault with the fists usually indicates that the assailant intends only to inflict a beating on the one assaulted—to inflict pain and humiliation but not great bodily harm, Hall v. State (Miss.), 1 So. 351; Waldrop v. State, 98 Miss. 567, 54 So. 66; Smith v. State (Miss.), 6 So. (2d) 134, but where the assailant is much superior physically to the one assaulted, the character of the assault, though with the fist only, may be such as to reasonably indicate that the one assaulted is in danger of such great bodily harm as to justify the use by him of a deadly weapon in defending himself from the assault.''

The rule was reannounced in Blaine v. State, 196 Miss. 603, 17 So. (2d) 549.

It is seen that the instruction in question is contrary to the rule announced in these cases and the effect of the instruction was to eliminate from consideration by the jury the only defense the appellant had.

Reversed and remanded.